## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**YOUSRY RIZK,**

           **Plaintiff,**

**v.**                               **Case No: 6:18-cv-1414-PGB-RMN**

**AKEBO PUGH, JOHNNY JEAN,
ANGEL ORTIZ, BIJU
VARGHESE, DENNIS M.
LEMMA and SEMINOLE
COUNTY, FLORIDA,**

           **Defendants.**

_____/

## <u>ORDER</u>

This cause comes before the Court on Defendants Johnny Jean, Dennis M. Lemma, Angel Ortiz, Akebo Pugh, Biju Varghese, and Seminole County, Florida's (collectively, the "**Defendants**") Motion for Summary Judgment (Doc. 219), Plaintiff Yousry Rizk's ("**Plaintiff**") response in opposition (Doc. 225), and Defendants' reply thereto (Doc. 226). Upon consideration, Defendants' Motion for Summary Judgment is due to be denied.

## I.   BACKGROUND

This case stems from Plaintiff's interaction with law enforcement and staff at the Seminole County Jail following his arrest. (Docs. 170, 216). At the time of the incident, Plaintiff was a 69-year-old retired schoolteacher, standing five-feet, five inches tall and weighing approximately 165-170 pounds. (Doc. 219-21, 7:21–

22, 10:12–11:10). Plaintiff is a naturalized U.S. citizen of Egyptian origin and has difficulty communicating and understanding English. (*See, e.g.*, *id.* 8:7–9:17, 16:15–23, 21:12–17, 34:12–15, 78:23–79:12; Docs. 219-4, 224).

The story dates back to January 18, 2018, when Plaintiff was arrested for misdemeanor charges of battery and resisting an officer without violence following an altercation with the director of Plaintiff's homeowner's association. (Doc. 216, ¶ 1). Plaintiff was transported to the Seminole County Jail (the "**Jail**"), a correctional facility for Defendant Seminole County, by Police Officer Ryan McIntosh ("**Officer McIntosh**"). (*Id.* ¶ 2). The Jail is overseen and operated by Defendant Sheriff Dennis M. Lemma ("**Sheriff Lemma**"), the Sheriff of Seminole County.[1]

Upon arrival at the Jail, Plaintiff exited the transport vehicle, and Officer McIntosh informed Plaintiff that they were "going to the door over there," pointing in the respective door's direction. (Doc. 216, ¶ 3). Plaintiff started to walk in the direction of the door but then, began walking in a direction away from it. (*Id.* ¶ 4) Officer McIntosh reminded Plaintiff of the direction of the door in which they were going in, although Plaintiff continued walking in the wrong direction. (*Id.* ¶ 5). Ultimately, Plaintiff complied and walked to the door alongside Officer McIntosh.

---

[1] Bodyworn camera footage captured Plaintiff's arrest, transport to Jail, and initial screening. (Docs. 219-4, 224). However, upon review, the Court puts little weight on the relevance of the footage considering it captured events *prior* to the use of force incident and thus, does not reveal what occurred in the ADA Room nor does it shed any light on the severity of the incident in question. The video merely confirms Plaintiff made some troublesome remarks, expressed verbal frustration with the underlying situation that led to his arrest, and was less forthcoming with his answers to screening questions. (Docs. 219-4, 224).

(*Id.* ¶ 5). Upon entrance, a Jail deputy asked Officer McIntosh if Plaintiff was resisting, to which Officer McIntosh replied, "In the Sallyport." (*Id.* ¶ 6).[2] Plaintiff was also asked various initial screening questions, including whether or not Plaintiff was injured or hurt. (*Id.* ¶¶ 7–8). Plaintiff responded, "Me? . . . I am hurt, yes." (*Id.* ¶ 8). Overall, however, Plaintiff was not fully cooperative in answering the deputies' intake questions. (*Id.* ¶ 9; Doc. 219-5, ¶ 4; Doc. 219-18, 16:20–17:25). In the conversation, Plaintiff stated he takes blood pressure medication and needed to see a doctor. (Doc. 216, ¶ 10).

Shortly thereafter, Deputies Akebo Pugh ("**Deputy Pugh**") and Johnny Jean ("**Deputy Jean**") escorted Plaintiff to a designated changing area in the Jail known as the ADA Room, where Deputy Angel Ortiz ("**Deputy Ortiz**") joined them. (*Id.* ¶ 12; Doc. 219-18, p. 84). Upon entry into the Jail, inmates are required to take off all outside clothing and change into the jail uniform provided. (Doc. 219-18, 8:17–9:3). The Jail had two designated rooms for inmates to change: an interview room dedicated to changing and a larger ADA holding cell (the "**ADA Room**"), notably for inmates "being particularly difficult." (*Id.* 9:4–10:10, 22:15–17). The latter ADA Room, to which Plaintiff was taken, had no camera. (*Id.* 39:17–

---

[2]   With regard to Plaintiff's "resistance" in the Sallyport—which was prior to the use of force incident—review of the bodyworn camera footage makes it questionable if Plaintiff even knew which door Officer McIntosh was referring to when he said "we are going to that door over there." (*See* Docs. 219-4, 224). The video depicts a number of doors on opposite ends of the Sallyport, and Officer McIntosh seems to have been *behind* Plaintiff when he was pointing in the direction in which he wanted Plaintiff to walk. (*See* Docs. 219-4, 224). The Court merely points this out to highlight the magnitude, or lack thereof, of Plaintiff's "resistance" following arrest.

19; Doc. 219-21, 89:7–12).[3] The parties' accounts of what happened next differ drastically. While it is undisputed that a use of force incident occurred while Plaintiff and Deputies Pugh, Jean, and Ortiz were in the ADA Room (Doc. 216, ¶ 14), the specifics remain the crux of this case.

### A.   Inside the ADA Room (Defendants' Account)

Defendants' versions of the events that unfolded in the ADA Room seem to align for the most part.

Defendants attest that Plaintiff's "uncooperative" behavior likely led Deputies Pugh, Jean, and Ortiz to escort Plaintiff to the ADA room "for security reasons." (Doc. 219-5, ¶ 4; Doc. 219-9, ¶¶ 3–4; *see* Doc. 219-18, 16:19–18:8 ("I don't know if either [the other changing] room was already occupied . . . . I would imagine we probably would have taken him to the [ADA room] anyway, just because the ADA holding cell was a more secure location.")).

Once inside, Plaintiff was pat searched, and his handcuffs were removed. (Doc. 219-5, ¶ 5; Doc. 219-9, ¶ 5; Doc. 219-18, 23:3–24:9, p. 82). Plaintiff was then "ordered several times to remove his clothing so that he could change into a jail uniform" but "refused, and continued being loud and argumentative." (Doc. 219-9, ¶ 5; *see* Doc. 219-5, ¶ 5; Doc. 219-18, 41:8–12). Plaintiff ultimately "began to take [his] clothing off, and then he threw it at [the Deputies]." (Doc. 219-9, ¶ 6; *see* Doc.

---

[3]   At one point, Defendants insist there was a video that captured Plaintiff *leaving* the ADA Room following the use of force incident—which would assist the Court in evaluating his condition and thus, possibly shed light on the severity of the incident—but the Jail no longer has a record of such video. (Doc. 216, ¶ 31). Therefore, it has no bearing on this Court's decision considering Plaintiff's far different account of what happened and his resulting injuries.

219-5, ¶ 6; Doc. 219-18, 41:8–42:25). Deputy Pugh testifies Plaintiff seemed to have an "issue with taking off his underwear." (Doc. 219-18, 19:3–5, 42:12–16). Deputy Pugh contends that the Deputies reminded him the changing process was a part of procedure, but Plaintiff continued to throw clothes at them. (*Id.* 19:6–20:5; Doc. 219-9, 7:22–8:2). No clothes actually hit the Deputies, as a Deputy was able to intercept any articles of clothing thrown. (Doc. 219-18, 24:10–16; Doc. 219-9, 7:22–8:2).[4] Deputy Pugh testified Plaintiff "was doing a lot of flailing of his arms and stuff like that" but made no "specific overt action towards" the Deputies that he could recall. (Doc. 219-18, 28:10–15; *see* Doc. 219-5, ¶ 7; Doc. 219-9, ¶ 6).

Shortly thereafter, Deputies Pugh and Jean each grabbed one of Plaintiff's arms—to which Deputy Jean testifies "[Plaintiff] pulled away"—and "redirected" him to the floor "slowly."[5] (Doc. 219-5, ¶ 7; Doc. 219-9, ¶ 6; Doc. 219-18, 33:1–

---

[4]   Deputy Pugh claims Plaintiff threw his underwear at another Deputy's face, but Deputy Pugh intercepted it. (Doc. 219-18, 19:6–20:5, 24:10–16). However, Deputy Ortiz does not recall any underwear. (Doc. 219-9, 20:23–21:1). In any event, Deputy Ortiz testified that Plaintiff threw his shirt at Deputy Ortiz, and while Deputy Ortiz caught it, such conduct soon prompted Plaintiff's "redirection" to the floor. (*Id.* 7:22–8:2).

[5]   There are some inconsistencies surrounding *why* the Deputies felt the need to "get physical control of [Plaintiff]." (Doc. 219-18, 27:2–28:3). Deputy Pugh testified that he "believed" Plaintiff's underwear was the last garment Plaintiff took off, prior to the Deputies restraining him. (*Id.* 27:1–22, 38:2–6). Deputy Pugh states that "at that point . . . the determination was made to move in and secure [Plaintiff] so that he could not throw any – you know, throw anything additional or that, you know, he could – to gain compliance of him at that point." (*Id.* 27:7–11). Deputy Pugh then clarified that he wasn't actually sure if Plaintiff was fully naked when the Deputies "moved in" on Plaintiff to "secure him"—he could have possibly "had his shirt still on." (*Id.* 27:2–22). The Court finds such uncertainty perplexing. If Plaintiff was in fact naked, he had nothing on his person to throw and thus, the reason Deputy Pugh felt the need to restrain Plaintiff did not necessarily exist. Nevertheless, Deputies Ortiz and Jean testify that it was not until Plaintiff was on the floor that all "remaining clothing was removed." (Doc. 219-5, ¶¶ 7–8; Doc. 219-9, ¶ 7). The Court only highlights this point of uncertainty because it implicates *why* the Deputies felt the need to restrain Plaintiff in the manner in which they did in the first place and the reasonableness of their response. Moreover, it

34:14, p. 83). Once Plaintiff was on the floor "in the prone position," Deputies Pugh and Jean remained control over Plaintiff's arms and Deputy Ortiz "took control of [Plaintiff's] legs." (Doc. 219-18, 36:17–23; *see* Doc. 219-5, ¶¶ 7–8; Doc. 219-9, ¶¶ 6–7). Deputies Ortiz and Jean testify that the Deputies then removed Plaintiff's remaining clothing, but Deputy Pugh does not recall if Plaintiff was naked at this point or still had clothes that needed to be removed. (Doc. 219-5, ¶ 8; Doc. 219-9, ¶ 7; Doc. 219-18, 27:2–28:3). Deputy Pugh attests Plaintiff was "[b]racing, tensing, moving around, trying to get out of – trying to get free of our control." (Doc. 219-18, 37:11–12; *see* Doc. 219-5, ¶ 7). "Once [Plaintiff] got to a point to where he wasn't actively trying to get free of us, [the Deputies] were able to actually start moving out of the cell." (Doc. 219-18, 37:15–17). Although Deputy Pugh could not recall, Deputies Jean and Ortiz testified that "[none of the Deputies] put a knee on Plaintiff or struck him in any manner." (Doc. 219-9, ¶ 7; *see* Doc. 219-5, ¶ 8; Doc. 219-18, 39:6–10). According to the Deputies' reports after the incident, the estimated time in which the restraint took place was five minutes. (Doc. 219-18, pp. 92–94).

### B. Inside the ADA Room (Plaintiff's Account)

Plaintiff, on the other hand, presents a far different—and much more concerning—narrative of what occurred in the ADA room. Plaintiff testifies that without explanation, Deputy Pugh ordered Plaintiff to strip down and change into

---

represents as an example of one of the many inconsistencies in the record—not just with regard to Plaintiff's account.

a jail uniform. (Doc. 219-21, 86:5–87:12, 98:3–12). Plaintiff "take[s] [his first] shirt off" and then, "some of [the deputies] take it from [him]." (*Id*. 99:18–100:9). Plaintiff's second shirt, Plaintiff admittedly takes off and "throw[s] it on the floor," near where Deputy Pugh was located. (*Id*. 100:17–101:3). At that point, Deputy Pugh "place[d] himself in position to attack . . . tak[ing] [Plaintiff's] arm, squeez[ing] it" to the point he fell down to the concrete floor. (*Id*. 91:9–11). Deputy Pugh then "dragged [Plaintiff] . . . like a ragged dog. With no—any kind of human being feeling." (*Id*. 92:3–5, 99:14–17).

Deputy Pugh, who Plaintiff states was much larger than him at 400 pounds, was so angry that he "choked me [and] put his legs in my belly," leading Plaintiff to fracture his ribs, urinate himself, and suffer a litany of other health problems. (*Id*. 91:12–13, 94:8–15, 107:18–112:9; *see* Doc. 216, ¶ 28). Plaintiff "become [sic] in a coma, [he] could not see." (Doc. 219-21, 91:13–16, 99:17). Plaintiff attests he was choked, and lost consciousness, twice and "fe[lt] that I'm going to die. . . . with severe pain and the suffering." (*Id*. 91:23–92:5, 107:18–112:9). And yet, Plaintiff felt "[Deputy Pugh] enjoy[ed] it" because after the Deputies had stripped Plaintiff of his remaining clothes and left him naked in the ADA room, Plaintiff heard "[a]ll of them . . . laughing." (*Id*. 96:21–98:2).

### C.    Medical Assistance Following Incident

After the use of force incident, Plaintiff was booked into the Jail at 10:16 a.m. (Doc. 216, ¶ 15). Considering the prior response to resistance, medical staff attended to Plaintiff to assess his condition. (Doc. 219-5, ¶ 9; Doc. 219-9, ¶ 8; Doc.

219-18, 61:8–12). Defendant Biju Varghese ("**Nurse Varghese**") had been notified that Plaintiff was complaining of chest pain, but once Nurse Varghese saw him, he attests that Plaintiff was "uncooperative" and "screaming mad because [Defendant Varghese was] a nurse, [and] not qualified to see him." (Doc. 219-22, 22:23–24, 27:6–7, 28:20). Although Nurse Varghese does not recall Plaintiff himself "complaining of chest pain at all," (Doc. 219-22, 33:3–6), Plaintiff testifies that he told Nurse Varghese he was in severe pain, specifically that he thought his ribs were broken. (Doc. 219-21, 122:9–24). However, the only injury Nurse Varghese could ascertain was a "minor cut" on Plaintiff's wrist. (Doc. 219-22, 32:17–20, 33:10–34:1; *see* Doc. 216, ¶ 18).

Shortly thereafter, at 10:52 a.m., Plaintiff's pain intensified and he requested to be seen again. (Doc. 216, ¶ 18; Doc. 219-21, 126:10–11). Plaintiff told Nurse Varghese his right arm was broken, but Nurse Varghese charted that there was "no swelling" and Plaintiff was uncooperative and "would not allow . . . for an assessment." (Doc. 216, ¶ 18; Doc. 219-8, pp. 7–8). Plaintiff, on the other hand, states he was "fully cooperating." (Doc. 219-21, 127:25–128:5). Later in the day, Plaintiff requested to be seen for a third time, and Nurse Varghese charted that Plaintiff again "complained of possible chest pain" and body aches on his right side. (Doc. 219-8, p. 8; Doc. 216, ¶ 19). However, Nurse Varghese simply charted Plaintiff's vitals. *(*Doc. 219-8, p. 8; Doc. 216, ¶ 19).

Records indicate that around 6:19 p.m., Plaintiff saw another Nurse, Nurse Holland, because he was still experiencing pain. (Doc. 216, ¶ 21; Doc. 219-21,

129:15–23). Although Plaintiff told Nurse Holland he had pain in his ribs that was "moving to my chest," Nurse Holland again charted his vitals, along with the observation that he saw no bruising or swelling, and offered Plaintiff pain medicine that he indicated he could not take. (Doc. 216, ¶ 21; Doc. 219-8, p. 4; Doc. 219-21, 129:24–132:8).

In sum, although Plaintiff complained of severe pain and requested assistance—specifically, a doctor and to go to the hospital—numerous times while he was at the Jail, no X-rays were taken, and no doctor examined him. (Doc. 216, ¶¶ 23–24; Doc. 219-21, 130:11–131:4; Doc. 219-22, 23:2–24:3, 27:23–25). Eventually, Plaintiff was booked out of the jail around 2:44 a.m., roughly sixteen hours after his arrival. (Doc. 216, ¶ 26). Immediately upon his release, Plaintiff requested an ambulance pick him up from the Jail and take him to the hospital. (*Id.* ¶ 27). There, his diagnosis included rib fractures, acute kidney injury, rhabdomyolysis, hyperkalemia, elevated creatine kinase, hypertensive chronic kidney disease, gout, gastritis, elevated white blood cell count, and gastro-esophageal reflux disease. (*Id.* ¶ 28).

### D.   The Lawsuit Begins

Ultimately, on August 28, 2018, Plaintiff initiated the instant lawsuit. (Doc. 1). Following years of litigation and various judicial rulings, Defendants filed the operative Fourth Amended Complaint on September 2, 2022, asserting the following causes of action: excessive force against Deputy Pugh in his individual capacity pursuant to §1983 (Count I); failure to intervene against Deputies Jean

and Ortiz in their individual capacities pursuant to §1983 (Count II); deliberate indifference to serious medical needs against Nurse Varghese in his individual capacity pursuant to §1983 (Count III); battery under Florida law against Deputy Pugh in his individual capacity, Sheriff Lemma in his official capacity, and Seminole County (Count IV); and intentional infliction of emotional distress under Florida law against Deputies Pugh, Jean, and Ortiz in their individual capacities (Count V). (Doc. 170). Defendants moved for summary judgment on all counts on the basis of either qualified immunity, statutory immunity under Florida Statute § 768.28(9)(a), or the factual record before the Court. (Doc. 219). Plaintiff responded in opposition (Doc. 225), and Defendants replied thereto (Doc. 226). Accordingly, the matter is now ripe for review.[6]

## II.   STANDARD OF REVIEW

A court may only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" to support

---

[6] The Court notes that it has extensively laid out the dueling versions of how the subject encounter played out, largely to indicate the clear presence of a genuine dispute of material fact. Every cause of action is predicated on the severity of the incident in dispute and consequently, credibility determinations that the Court cannot resolve.

its position that it is entitled to summary judgment. FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials." FED. R. CIV. P. 56(c)(3).[7]

"The burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). "The court need consider only the cited materials" when resolving a motion for summary judgment. FED. R. CIV. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam) (holding that a district court does not err by limiting its review to the evidence cited by the parties in their summary judgment briefs).[8]

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).

---

[7]   "The Court notes that it is not the responsibility of the court to search the record to determine whether a motion for summary judgment should be granted or to find reasons why a properly supported motion should be denied." *Kaazar Cap. Partners Ltd. v. Bactrac Techs., LLC*, No. 17-CV-2721-AT, 2019 WL 2147578, at *8 n.12 (N.D. Ga. Mar. 14, 2019); *see, e.g.*, *Impreglon, Inc. v. Newco Enters., Inc.*, 508 F. Supp. 2d 1222, 1241 n.16 (N.D. Ga. 2007) ("[I]t is not the Court's duty to comb the record in an attempt to find reasons to grant [a] Motion for Summary Judgment."); *Tomasini v. Mount Sinai Med. Ctr. of Fla., Inc.*, 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004).

[8]   "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

However, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). Ultimately, summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

In sum, Defendants argue that they are entitled to summary judgment on each count of the Fourth Amended Complaint. (Doc. 219). Specifically, Nurse Varghese and Deputies Pugh, Jean, and Ortiz argue that summary judgment must be granted on Counts I, II, and III because they acted in their discretionary capacity as government officials and are protected by qualified immunity. (*Id.* at pp. 12–22). Deputy Pugh, Sheriff Lemma, and Seminole County argue that summary judgment must be granted on Count IV because they have immunity under Florida Statute § 768.28(9)(a). (*Id.* at pp. 22–23). And, Deputies Pugh, Jean, and Ortiz argue that summary judgment must be granted on Count V because they have immunity under Florida Statute § 768.28(9)(a). (*Id.* at pp. 24–25). The Court addresses each challenged cause of action in turn. Ultimately, the Court concludes that summary judgment must be denied on all counts.

### A.    Qualified Immunity

Defendant Nurse Varghese and Deputies Pugh, Jean, and Ortiz move for summary judgment as to Counts I, II, and III on the grounds that they are entitled to qualified immunity from Plaintiff's § 1983 excessive force, failure to intervene, and deliberate indifference claims. (Doc. 219).

Qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *e.g.*, *Jacoby v. Baldwin County*, 835 F.3d 1338, 1343–44 (11th Cir. 2016) (quoting *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996)).

If a government official can demonstrate he or she was acting within the scope of their discretionary authority, then the burden shifts to the plaintiff to demonstrate that qualified immunity is inappropriate by affirmatively putting forward evidence that establishes the government official violated their rights and by showing that those rights were clearly established at the time of the misconduct. *Jacoby*, 835 F.3d at 1344; *see Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) ("Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of

the challenged conduct."); *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021).[9] Courts have discretion to decide the order in which to engage these two prongs," but they may not, under either prong, "resolve genuine disputes of fact in favor of the party seeking summary judgment. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). "If, at the summary judgment stage, the evidence construed in the light most favorable to the plaintiff shows that there are facts inconsistent with granting qualified immunity, then the case and the qualified immunity defense proceed to trial." *Stryker v. City of Homewood*, 978 F.3d 769, 773 (11th Cir. 2020)

First, the parties do not appear to dispute that Defendants were acting within their discretionary authority for purposes of qualified immunity. (*See* Doc. 225, p. 19).[10] As such, the burden shifts to Plaintiff to demonstrate Defendants are not entitled to summary judgment on qualified immunity grounds. To do so, Plaintiff must prove that a reasonable jury could interpret the factual record to show that Defendants violated a constitutional right that was clearly established at the time of the acts in question. A plaintiff can establish a constitutional right in one of three ways: (1) showing case law by an appropriate court with materially similar facts clearly establishing the constitutional right; (2) showing that a clearly established broad principle should control the facts of Plaintiff's case; or (3)

---

[9]   With regard to the state law claims, officers are entitled to statutory immunity when acting within the course and scope of their employment with respect to the alleged excessive use of force. *See City of Maitland v. Heatwole*, 546 So. 2d 63, 64 (Fla. 1st DCA 1989); FLA. STAT. § 768.28(9)(a); *infra* Section III.B.

[10]  Accordingly, the Court will not address the merits of this initial requirement.

showing conduct that is so egregious that a constitutional right was clearly violated, and prior case law is unnecessary. *Davis v. Waller*, 44 F.4th 305, 1312–13 (11th Cir. 2022); *Richmond v. Badia*, 47 F.4th 1171, 1183–84 (11th Cir. 2022).

      1.    *Count I - Excessive Force (Deputy Pugh)*

In Count I, Plaintiff argues that Deputy Pugh violated Plaintiff's Fourteenth Amendment Due Process rights by using objectively unreasonable and excessive force against Plaintiff. (Doc. 170, ¶¶ 80–97). Defendant Deputy Pugh moves for summary judgment on Plaintiff's excessive force claim, arguing that he did not violate a clearly established constitutional right and thus, is at least entitled to qualified immunity. (Doc. 219, pp. 12–14).

A Fourteenth Amendment excessive force claim requires, first, that a law enforcement officer purposely or knowingly use force against a pretrial detainee and, second, that the application of force be done in a way that is objectively unreasonable, without regard to an officer's subjective intent to harm. *Watkins v. Pinnock*, 802 F. App'x 450, 461 (11th Cir. 2020) (citing *Piazza v. Jefferson County*, 923 F.3d 947, 952 (11th Cir. 2019)). Whether the use of force is objectively unreasonable is determined using the particular facts and circumstances of each case, and the court must make this determination based on the perspective of a reasonable officer on the scene, including what the officer knew at the time of incident, not with the court's benefit of hindsight. *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015) (*citing Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Considerations to help determine objective reasonableness include, but are not limited to: 1) "the need to use force to preserve internal order and maintain institutional security;" 2) the relationship between the need for the use of force and the amount of force used; 3) the extent of the plaintiff's injury which resulted from the use of force; 4) "any effort made by the officer to temper or limit the amount of force used;" 5) "the severity of the security problem at issue" and "the threat reasonably perceived by the officer;" and 6) "whether the plaintiff was actively resisting." *Id.*; *Graham*, 490 U.S. at 396. Moreover, once the need for an application of force ceases, any continued application of a harmful force can be a violation of the Fourteenth Amendment. *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991); *see Piazza*, 923 F.3d at 953.

Simply put—as the Court has extensively detailed herein—the record reveals sharply dueling accounts of the use of force incident that transpired in the ADA room. Essentially, Deputy Pugh argues he is entitled to summary judgment on Plaintiff's excessive force claim because he "utilized the least amount of force to gain control of Plaintiff, by directing him to the floor with the assistance of two other deputies." (Doc. 219, p. 14). Deputy Pugh further contends, albeit without reason, that Plaintiff's allegations that Deputy "Pugh choked him and used his leg to cause him injuries" are "so unreasonable that no jury would believe his story." (*Id.* at p. 14).

Therein, however, lies the problem. Accepting such an argument would directly result in the Court patently disregarding Plaintiff's account of what

occurred in the ADA room, which has yet to be contradicted by evidence in the record.[11] With Plaintiff's best case in hand, Plaintiff—confused, embarrassed, and already pat searched—was forced to strip naked in front of Deputies Pugh, Jean, and Ortiz. Upset, Plaintiff admittedly threw his shirt on the floor near the location of a deputy, to which Deputy Pugh reacted by taking Plaintiff to the ground, choking him, fracturing his ribs, and causing him to urinate himself. (Doc. 219-21, 91:12–13, 94:8–15; *see* Doc. 216, ¶ 28).[12] Deputy Pugh himself testified that Plaintiff—a 69-year-old man half Deputy Pugh's size—made no "specific overt action towards" the Deputies that he could recall. (Doc. 219-18, 28:10–15; *see* Doc. 219-5, ¶ 7; Doc. 219-9, ¶ 6). At most, surrounded by three deputies and already pat searched for contraband, Plaintiff threw his shirt to the ground—in agitation he had to strip naked—and Deputy Pugh perceived him to flail his arms.

Considering Plaintiff's version of the facts, which the Court must accept as true, an objectively reasonable deputy would not have found Plaintiff's actions rose to a consequential level of resistance or posed an immediate threat sufficient to

---

[11]   "[A] plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." *Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019). Plaintiff's testimony simply does not fall into any of the aforementioned categories. Although Defendants attempt to argue Plaintiff's testimony is inconsistent, the reality is that so is Defendants—in fact, even the Deputies' versions of the incident differ to some extent. For example, see *supra* notes 4–5.

[12]   The Court highlights that Plaintiff requested an ambulance pick him up from the Jail and take him to the hospital immediately after he was released. (Doc. 216, ¶ 27). There, his diagnosis included a litany of ailments, such as rib fractures and elevated levels of creatine kinase. (*Id.* ¶ 28). Notably, Defendants do not point to anything in the record that would suggest that Plaintiff's aforementioned diagnosis was a result of something other than the use of force incident.

justify choking and squeezing Plaintiff to the point of unconsciousness, fractured ribs, and urination. At most, Plaintiff—who had already undergone a pat search—threw his shirt in frustration with being forced to strip naked and verbally expressed his dissatisfaction with the situation. (*See, e.g.*, Doc. 219-18, 23:3–24:9, p. 82; Doc. 219-21, 86:5–87:12, 98:3–12; 100:17–101:3). As such, Plaintiff presented a negligible threat to begin with. Plaintiff never made any "overt action towards" the Deputies, and nothing in the record insinuates Plaintiff "actively resisted" or was combative in any other way. (Doc. 219-18, 28:10–15; *see* Doc. 219-5, ¶ 7; Doc. 219-9, ¶ 6).[13] In fact, Deputy Ortiz testified he felt Plaintiff posed no serious threat of danger. (Doc. 219-17, 16:7–15). Thus, the severity of a security threat, and any corresponding risk to the officers, was exceedingly minimal, if present at all.

In any event, the ADA Room itself was small and confined, Plaintiff had no access to weapons or anything dangerous of the sort, and he was considerably older and much smaller than the *three* other Deputies surrounding him in the room. (*See* Doc. 219-6, pp. 6, 10–13). Thus, considering the facts in the light most favorable to Plaintiff, it is hard to believe a deputy would reasonably perceive that the circumstances discussed herein threatened their safety or institutional security,

---

[13] The Court highlights that when considering the circumstances in the light most favorable to Plaintiff, it is somewhat dissonant to conclude Plaintiff was "actively resisting"—Plaintiff, *who was originally instructed to undress*, testifies he "threw" his shirt off on the floor near the Deputies. (Doc. 219-21, 100:17–101:3). While Defendants contend he was simply uncooperative, Plaintiff suggests he was confused and upset that he had to strip naked in front of three other men.

much less warranted the extent of Deputy Pugh's force. Further, there is no indication in the record that Deputy Pugh made an effort to temper or limit the amount of force he used over the estimated five minutes in which the restraint took place. Not to mention, Plaintiff attests he lost consciousness and was choked *twice*, which only further suggests Deputy Pugh did not attempt to temper the amount of force he used. (Doc. 219-21, 107:18–109:11).

Assuming force was even necessary to regain control of Plaintiff, the amount of force employed here greatly exceeded that necessary to maintain order and security. In fact, the Chief of Corrections for the Seminole County Sheriff's Office, Laura Bedard, testified that once Plaintiff "was laying on the floor in a prone position and no longer resisting, a choke would not be justified" and would constitute excessive force. (Doc. 219-11, 54:7–19). Moreover, Captain Howard testified that choking in any situation that is not a Level 6, where the officer's life is in danger or jeopardy—which was not the case here—would be considered excessive. (Doc. 219-13, 54:18–56:19). Not only was the force used excessive but also the resulting injuries were severe. Accordingly, a reasonable jury could find Deputy Pugh used excessive force when considering the factual record in the light most favorable to Plaintiff. As such, there is a genuine issue of material fact precluding summary judgment on whether a constitutional violation occurred.

Even assuming the force is deemed excessive, to overcome Deputy Pugh's qualified immunity defense, Plaintiff must further demonstrate that the unlawfulness of Deputy Pugh's conduct was "clearly established" at the time of the

alleged incident. *E.g.*, *Pearson v. Callahan*, 555 U.S. 223 (2009). The law must be clear enough that it provided the officer "fair warning" his conduct was unconstitutional. *E.g.*, *Glasscox v. City of Argo*, 903 F.3d 1207, 1218 (11th Cir. 2018). However, the "'rule requiring particularized case law to establish clearly the law in excessive force cases' has '[a] narrow exception,'" deemed the "obvious clarity rule." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000); *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009). The rule provides that "an excessive-force plaintiff can overcome qualified immunity only by showing that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw" on point. *Glasscox*, 903 F.3d at 1218 (*Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)). "This test entails determining whether application of the excessive force standard would inevitably lead every reasonable officer in the Defendants' position to conclude the force was unlawful." *Priester*, 208 F.3d at 926–27.

First, Deputy Pugh was on notice that his actions were unconstitutional based on settled case law. As Plaintiff points out, it has long been established that an officer's use of force after a detainee is no longer resisting or is only minimally resisting violates clearly established constitutional rights. *See, e.g.*, *Skrtich v. Thornton*, 280 F.3d 1295, 1304–05 (11th Cir. 2002); *Lee v. Ferraro*, 284 F.3d 1188, 1197–2000 (11th Cir. 2002) ("[T]he force used by [defendant] after effecting [plaintiff's] arrest was unnecessary and disproportionate."); *Mercado v. City of*

*Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005); *Slicker v. Jackson*, 215 F.3d 1225, 1227 (1th Cir. 2000).

In any event, assuming a jury accepts Plaintiff's testimony, Deputy Pugh's conduct was so obviously egregious that prior case law establishing such excessive force is unnecessary. *Glasscox*, 903 F.3d at 1218. Accepting the evidence in the light most favorable to Plaintiff, any reasonable officer in Deputy Pugh's position would conclude that given the circumstances, choking Plaintiff to the point of unconsciousness, fractured ribs, and urination was unlawful.

Ultimately, since the Court cannot evaluate the credibility of evidence on summary judgment, the only crystal-clear result that the factual record points to is that the determination of what actually happened in the ADA room is for the jury, not this Court. *See Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002) (holding if there are facts inconsistent with granting qualified immunity at summary judgment, then "the case and the qualified immunity issue along with it will proceed to trial"); *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016) ("[Courts] do not weigh conflicting evidence or make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *Stryker v. City of Homewood*, 978 F.3d 769, 777 (11th Cir. 2020) ("Very little is clear about exactly what happened . . . . The officers articulate a version of events that justifies their [said] use of force. [Plaintiff] tells a story that presents a clear constitutional violation. Resolving that dispute is for a trial, not summary judgment."). As such, at this stage, the Court cannot resolve qualified immunity

with regard to the excessive force claim against Deputy Pugh, and summary judgment is denied. *See Glasscox*, 903 F.3d at 1219–20.

2.     *Count II – Failure to Intervene (Deputies Jean and Ortiz)*

Plaintiff further asserts that both Deputy Jean and Deputy Ortiz failed to intervene to stop the excessive use of force. (Doc. 170, ¶¶ 98–114). Deputies Jean and Ortiz argue that they are entitled to summary judgment on Plaintiff's failure to intervene claim because Deputy Pugh did not use excessive force, and even if he did, Deputies Jean and Ortiz did not have the ability to intervene. (Doc. 219, pp. 14–16). In opposition, Plaintiff contends that Deputy Jean and Ortiz's argument that there was no excessive force fails for the same reason as Deputy Pugh's. (Doc. 225, pp. 11–13).

An officer can be liable for failing to intervene when another officer uses excessive force. *See Priester*, 208 F.3d at 927; *Ireland v. Prummell*, 53 F.4th 1274, 1301 (11th Cir. 2022). "This liability, however, only arises when the officer is in a position to intervene and fails to do so." *Priester*, 208 F.3d at 925; *see Hadley v. Guiterrez*, 526 F.3d 1324, 1330–31 (11th Cir. 2008).

Viewing the record in the light most favorable to Plaintiff, the Court has already determined that Plaintiff has introduced sufficient evidence to support a reasonable jury finding that Deputy Pugh used excessive force. *See supra* Section III.A.1. Therefore, the Court must now ascertain if Deputies Jean and Ortiz had the ability to intervene.

As previously indicated, after Deputies Pugh and Jean took Plaintiff to the floor, Deputy Jean maintained control over Plaintiff's arms and Deputy Ortiz "took control of [Plaintiff's] legs" while Deputy Pugh choked Plaintiff. (Doc. 219-18, 36:17–23; *see* Doc. 219-5, ¶¶ 7–8; Doc. 219-9, ¶¶ 6–7; Doc. 219-21, 91:12–13, 94:8–15, 107:18–112:9). According to the Deputies' reports following the incident, the estimated time in which the restraint took place was five minutes. (Doc. 219-18, pp. 92–94). There was no other inmate in the room, and all attention was clearly on Plaintiff during the encounter. (*See* Doc. 219-14, 18:12–14, 22:19–23:15; Doc. 219-17, 13:4–10). As such, a reasonable jury could find that Deputies Jean and Ortiz had ample time and opportunity to intervene to protect Plaintiff, but chose not to. *See Howard v. Wilkinson*, 305 F. Supp. 3d 1327, 1341 (noting that officers have time to intervene even when the "events happen[] very quickly" (quotation omitted)); *Priester*, 208 F.3d at 925 (finding two minutes was enough time for officers to intervene). In fact, Deputy Jean admitted that if Deputy Pugh acted in the manner Plaintiff testifies he did, Deputies Jean and Ortiz would have "absolutely" had the ability to intervene. (Doc. 219-14, 40:23–41:7). Thus, considering the disputed issues of material fact as to what occurred in the ADA room, the issue of whether or not Deputies Jean and Ortiz failed to intervene must go to the jury.

With regard to qualified immunity, an officer's duty to intervene upon witnessing the use of excessive force and having the ability to intervene has been clearly established since long before 2018 when the subject incident occurred. *See*

*Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986); *Priester*, 208 F.3d at 924–25. Moreover, the Court agrees with Plaintiff that no particularized case law is necessary for a reasonable officer to know, given the circumstances of this case, that he should intervene if his fellow officer is choking a detainee to the point of unconsciousness. *See Priester*, 208 F.3d at 927–28; (Doc. 225, pp. 12–13). Therefore, Deputies Jean and Ortiz are not entitled to qualified immunity at this juncture, and summary judgment is denied.

3.      *Count III – Deliberate Indifference (Nurse Varghese)*

Plaintiff also brings a § 1983 claim against Nurse Varghese for deliberate indifference to a serious medical need. (Doc. 170, ¶¶ 115–27). However, Nurse Varghese argues he is entitled to summary judgment and qualified immunity on this claim. (Doc. 219, pp. 16–22).

Deliberate indifference to a pretrial detainee's serious medical needs constitutes a Fourteenth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1115 (11th Cir. 2005). To prevail on a deliberate-indifference claim, Plaintiff must show: "(1) a serious medical need; (2) deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).

On the first prong, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting

*Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). Alternatively, a medical need is serious where the delay in treatment "worsens the condition." *Id.* "In either case, 'the medical need must be one that, if left unattended, poses a substantial risk of serious harm.'" *Id.* (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).

Inadvertent failures to furnish necessary medical treatment fall short of generating constitutional claims. The second prong therefore requires Plaintiff to establish: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). Not that a defendant must know the precise nature of a detainee's injuries and ignore them to expose him or herself to liability. *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 252 (5th Cir. 2018) (concluding that courts do not require state officials to be warned of a "*specific* danger" to be held liable for deliberate indifference to a serious medical need). "Liability can attach even if a prison official knows only that, if no action is taken, the detainee faces a 'substantial risk of serious harm.'" *Taylor v. Hughes*, 910 F.3d 729, 734 (11th Cir. 2019).

A jail official "disregards a serious risk by more than mere negligence 'when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate.'" *Dang ex rel. Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (quoting *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997)). A "delay in medical

treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." *Hill*, 40 F.3d at 1189. "A few hours' delay" in treating major injuries, like "broken bones [or] bleeding cuts may constitute deliberate indifference." *Harris v. Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994).

A deliberate indifference claim may be predicated on "a showing of grossly inadequate care [or] a decision to take an easier but less efficacious course of treatment." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Likewise, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Dang*, 871 F.3d at 1280 (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)).

With regard to the first prong—the objectively serious medical need—it is undisputed that Plaintiff suffered fractured ribs. (Doc. 216, ¶ 26). As such, Plaintiff satisfies his burden in demonstrating that his injuries constitute an objectively serious medical need. *See Sherman v. Quest*, No. 18-60973-CIV, 2020 WL 6791100, at *24 (S.D. Fla. Nov. 19, 2020) ("The Court here assumes that two fractured ribs constitute an objectively serious medical condition."); *Minnis v. GEO Corp.*, No. 17-20575-CV, 2019 WL 5926898, at *8 (S.D. Fla. Oct. 9, 2019), *report and recommendation adopted*, No. 17-CV-20575, 2019 WL 5887369 (S.D. Fla. Nov. 12, 2019) ("A reasonable juror could conclude that Plaintiff's injuries are an objectively serious medical need. It is undisputed that Plaintiff had nondisplaced anterior left sixth and seventh right rib fractures.").

Thus, Nurse Varghese argues that prong two has not been established, specifically that Plaintiff has failed to demonstrate that Nurse Varghese had subjective knowledge of Plaintiff's injuries or of any risk of serious harm, much less that he recklessly disregarded such risk. (Doc. 219, pp. 19–21). Alas, the Court disagrees. Considering the facts in Plaintiff's favor, a reasonable jury could find that Nurse Varghese—having interacted and "assessed" Plaintiff following the use of force incident—had subjective knowledge of a risk of serious harm and disregarded that risk by conduct that is more than mere negligence. *See Brown*, 387 F.3d at 1344, 1351; *see also McElligott v. Foley*, 182 F.3d 1248, 1256–58 (11th Cir. 1999) (finding viable deliberate-indifference claims against jail-employed doctor and nurse who, despite receiving pain complaints from detainee, failed to pursue "further diagnosis of and treatment for the severe pain [the plaintiff] was experiencing").

First, Nurse Varghese emphasizes that he had no subjective knowledge of Plaintiff's "serious medical needs" because aside from a minor cut on Plaintiff's wrist, none of his injuries were visible. (Doc. 219, pp. 19–21). However, this argument seems to blatantly ignore the fact that Plaintiff explicitly told Nurse Varghese numerous times—from the very first time they interacted—that he had "severe pain" and thought his ribs were broken. (Doc. 219-21, 121:7–123:19). In fact, the very reason Nurse Varghese testifies he initially responded to the incident was because Plaintiff complained of chest pain. (Doc. 219-22, 22:23–25:14).

Nevertheless, Nurse Varghese charted a minor cut on Plaintiff's wrist, leaving Plaintiff without further evaluation. (Doc. 216, ¶ 17).

A bit later, still in pain, Plaintiff requested to be seen again. (*See id.* ¶ 18; Doc. 219-21, 126:10–11). Plaintiff told Nurse Varghese, "I need to go to the hospital because my ribs is [sic] broken." (Doc. 219-21, 123:15–20). Plaintiff further identified to Nurse Varghese that he had kidney problems and thought he "had a broken right arm." (Doc. 219-21, 123:15–124:8; Doc. 216, ¶ 18). Nurse Varghese was already aware Plaintiff took blood pressure medication. (Doc. 216, ¶ 17). However, Nurse Varghese charted that there was "no swelling" and Plaintiff was uncooperative." (Doc. 216, ¶ 18; Doc. 219-8, pp. 7–8). Plaintiff, on the other hand, states he was "fully cooperating." (Doc. 219-21, 127:25–128:5). Again, Plaintiff was left with a cursory assessment of his condition.

A third time, Plaintiff called for medical attention, and Nurse Varghese responded. (*Id.* ¶ 19; Doc. 219-22, 62:13–66:10). During that encounter, Plaintiff complained of body pain, chest pain, and aching. (Doc. 216, ¶ 19; Doc. 219-22, 62:13–65:6). Alas, Nurse Varghese simply took Plaintiff's blood pressure, pulse, and respirations. (Doc. 216, ¶ 19; Doc. 219-22, 65:7–24). Plaintiff was still experiencing pain in his ribs that was "moving to my chest," and later, saw Nurse Holland. (Doc. 216, ¶ 21; Doc. 219-8, p. 4; Doc. 219-21, 129:24–132:8). Upon release from the Jail, Plaintiff immediately called for an ambulance and was ultimately diagnosed with one of the very ailments he complained of to Nurse Varghese. (Doc. 216, ¶ 28).

Simply put, the reality is that based on Plaintiff's version of events, Nurse Varghese made a cursory attempt at best to examine Plaintiff's condition. *See Dang*, 871 F.3d at 1280; *Mandel*, 888 F.2d at 789. No doctor was called—although Plaintiff begged for one multiple times, specifically complaining of broken ribs—no x-rays were taken, and emergency services were not requested, even though such action was warranted. (*See* Doc. 216, ¶¶ 23–24; Doc. 219-22, 23:2–24:3, 27:23–25, 72:1–73:19, 75:24–7:18 (Nurse Varghese responding "Yes" when being asked "If you had known [Plaintiff] fractured two ribs, would you have had him seen by a doctor or gotten an X-ray of some sort?")). Everyone "ignore[d] [Plaintiff's] crying for pain," and he was simply offered ibuprofen—a medicine he could not even take. (Doc. 219-21, 145:5–11; Doc. 219-22, 55:24–56:3, 111:23–112:8). Ultimately, roughly sixteen hours following the use of force incident, Plaintiff was released and immediately called an ambulance from the Jail to transport him to the hospital where he was diagnosed with, among other things, rib fractures, acute kidney injury, rhabdomyolysis, hyperkalemia, elevated creatine kinase, hypertensive chronic kidney disease, and an elevated white blood cell count. (Doc. 216, ¶ 28). As such, considering the facts in the light most favorable to Plaintiff, there is ultimately sufficient evidence in the record that would permit a jury to infer that Nurse Varghese acted with deliberate indifference to Plaintiff's serious medical needs. *See Goebert v. Lee County*, 510 F.3d 1312, 1328 (11th Cir. 2007) ("Choosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness.").

Finally, the evidence supports a reasonable jury finding that Nurse Varghese's deliberate indifference caused Plaintiff's harm. *See, e.g.*, *Mann*, 588 F.3d at 1306–07. For one, Plaintiff's ultimate diagnoses and hospitalization, given the circumstances, establish a jury question as to injury causation. *See Patel v. Lanier County Georgia*, 969 F.3d 1173, 1190 (11th Cir. 2020). And, in any event, Nurse Varghese's conduct caused a delay of over sixteen hours for Plaintiff to receive medical attention for serious conditions, which a jury could reasonably find caused harm. *See Goebert*, 510 F.3d at 1327 ("Causation, of course, can be shown by personal participation in the constitutional violation."); *Patel*, 969 F.3d at 1190.

With regard to qualified immunity, Nurse Varghese violated a right that was clearly established, as "a reasonable person would have known" that delaying treatment of the various conditions discussed herein could "detrimentally exacerbate the medical problem." *See Valderrama v. Rousseau*, 780 F.3d 1108, 1121 (11th Cir. 2015) ("[I]t is 'clearly established . . . that an official acts with deliberate indifference when he intentionally delays providing . . . access to medical treatment, knowing that the [detainee] has a life-threatening condition or an urgent medical condition that would be exacerbated by delay."); *Harper v. Lawrence County*, 592 F.3d 1227, 1235 (11th Cir. 2010). Moreover, "[t]he knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985); *see Patel*, 969 F.3d at 1190. As such, taking Plaintiff's account of the facts as

30

true, qualified immunity cannot be applied at this stage, and Plaintiff's claim for deliberate indifference against Nurse Varghese survives summary judgment.

### B.   State Law Claims

Deputy Pugh, Sheriff Lemma, and Seminole County move for summary judgment on Plaintiff's state law tort claims, arguing that they are immune from suit pursuant to Florida Statute § 768.28(9)(a). (Doc. 219, pp. 22–24).

Similar to qualified immunity under federal law, Florida Statute § 768.28(9)(a) provides police officers immunity from personal liability in tort for injuries or damages they cause while acting within the scope of their employment.[14] FLA. STAT. § 768.28(9)(a). When individual immunity under § 768.28(9)(a) attaches, a police officer, employee, or state agent is protected not just from liability, but from being sued for state tort claims. *Furtado v. Yun Chung Law*, 51 So. 3d 1269, 1277 (Fla. 4th DCA 2011). However, an officer may face personal liability for injuries and damages that he causes, and thus immunity will not attach, if he "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." FLA. STAT. § 768.28(9)(a).

---

[14]   Again, the parties do not dispute that Deputy Pugh was acting within the scope of his employment. *See supra* p. 14; (*see also* Doc. 225, p. 19).

1. *Count IV – Battery (Deputy Pugh, Sheriff Lemma, and Seminole County)*

Deputy Pugh, Sheriff Lemma, and Seminole County move for summary judgment on Plaintiff's claim for battery, arguing immunity from suit pursuant to Florida Statute § 768.28(9)(a). (Doc. 219, pp. 22–24).

Under Florida law, a battery occurs when a person "actually and intentionally touches or strikes another person against the will of the other" or "intentionally causes bodily harm to another person." *Wilson v. Williams*, No. 19-cv-822, 2019 WL 6324265, at *5 (M.D. Fla. Nov. 26, 2019) (citing FLA. STAT. § 784.03). A long-recognized exception is that law enforcement officers carrying out their lawful duties are ordinarily not liable for battery unless the force applied in carrying out those duties is excessive. *See City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) (citing *Jennings v. City of Winter Park*, 250 So. 2d 900, 902 (Fla. 4th DCA 1971), and RESTATEMENT (SECOND) OF TORTS § 132 cmt. a (AM. L. INST. 1965)); *see also Mazzilli v. Doud*, 485 So. 2d 477, 481 (Fla. 3d DCA 1986). "A battery claim [against a law enforcement officer] for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *Sanders*, 672 So. 2d at 47 (citing *Dixon v. State*, 132 So. 684 (Fla. 1931)).

However, as previously stated, an officer acting within the scope of his employment is immune from personal liability in tort unless he "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard

of human rights, safety, or property." FLA. STAT. § 768.28(9)(a). The term "bad faith" equates to the actual malice standard. *Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So. 2d 163, 167 (Fla. 1st DCA 1998). "'[M]alicious purpose . . . has been interpreted as meaning the conduct was committed with 'ill will, hatred, spite, [or] an evil intent'"—or, as more simply stated, "the subjective intent to do wrong." *Peterson v. Pollack*, 290 So. 3d 102, 109 (Fla. 4th DCA 2020) (quoting *Eiras v. Florida*, 239 F. Supp. 3d 1331, 1343, 1345 (M.D. Fla. 2017)). Lastly, the phrase "wanton and willful" has been defined as the following:

> Willful and wanton conduct is generally something more than ordinary negligence but less than deliberate conduct. Most definitions of willful or wanton conduct require that it appear that the defendant had knowledge of existing conditions, was conscious from such knowledge that injury would likely or probably result from his conduct, and with reckless indifference to the consequences consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.

*Lemay v. Kondrk*, 923 So. 2d 1188, 1192 (Fla. 5th DCA 2006) (citation omitted).

Accepting Plaintiff's version of the facts, the Court has already concluded that a reasonable jury could find Deputy Pugh employed excessive force. *See supra* Section III.A.1. Here, the Court is also persuaded that a reasonably jury could conclude that Deputy Pugh acted in bad faith, with malice, or with wanton and willful disregard of Plaintiff's rights. As detailed with respect to previous counts, evidence in the record lends support to Plaintiff's version of events in which Plaintiff—already pat searched and not exhibiting any "specific overt action towards" the Deputies—was ordered to undress, but upon throwing his shirt to the

33

ground in frustration and/or confusion, was choked to the point of unconsciousness, fractured ribs, and uncontrolled urination. (Doc. 219-18, 28:10–15; *see, e.g.*, Doc. 219-5, ¶ 7; Doc. 219-9, ¶ 6; Doc. 216, ¶ 28; Doc. 219-21, 91:12–13, 91:23–92:5, 94:8–15, 107:18–108:14). There are no allegations, beyond Plaintiff's agitation, that Plaintiff posed a threat or actively resisted.[15] And yet, Plaintiff also attests that he was at one point "dragged. . . like a ragged dog. With no—any kind of human being feeling." (Doc. 219-21, 92:3–5, 99:14–17). In fact, Plaintiff felt "[Deputy Pugh] enjoy[ed] it" because when the Deputies left the ADA room after the incident, Plaintiff heard "[a]ll of them . . . laughing." (*Id.* 96:21–98:2). As such, viewing the facts most favorably to Plaintiff, a reasonable trier of fact could conclude that Deputy Pugh's conduct was in bad faith, malicious, or with wanton and willful disregard for Plaintiff's rights.

On the other hand, a Florida municipality or its subdivisions—here, Sheriff Lemma and Seminole County—may be "held liable for an employee's intentional act(s) as long as the employee is acting within the course and scope of his employment and the act or omission is not committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of the plaintiff's rights." *City of Boynton Beach v. Weiss*, 120 So. 3d 606, 611 (Fla. 4th DCA 2013) (citing *Simpson*, 172 So. 2d at 436, and FLA. STAT. § 768.28 (delineating when the state of Florida has waived sovereign immunity)). As for good faith, "[t]he

---

[15] In fact, when asked if Deputy Ortiz felt Plaintiff "posed a serious threat of danger" to any of the deputies after Plaintiff threw his shirt, Deputy Ortiz testified, "No." (Doc. 219-17, 16:7–15).

[municipality] is immune as a matter of law only if the acts are so extreme as to constitute a clearly unlawful usurpation of authority the [officer] does not rightfully possess, or if there is not even a pretense of lawful right in the performance of the acts." *McGhee v. Volusia County*, 679 So. 2d 729, 733 (Fla. 1996); *see Carestio v. Sch. Bd. of Broward Cnty.*, 866 So. 2d 754, 756–57 (Fla. 4th DCA 2004) (concluding that school employees who kicked and punched a student after removing him from class for disruptive behavior were acting within the scope of employment, and directing the factfinder to determine whether the employees were acting in a willful and wanton manner).

As previously indicated, it is undisputed that Deputy Pugh was acting within the course and scope of his employment. (*See* Doc. 225, p. 19). Deputy Pugh had the lawful authority to restrain detainees and respond with force if necessary to maintain order in a situation. (*See* Doc. 219-12, p. 137 ("When meeting resistance to lawful commands, Deputy Sheriffs and Detention Deputies are vested with the authority to respond accordingly to protect themselves and the public welfare. . . . [However,] [o]nly that degree of force reasonably necessary to accomplish lawful objectives . . . is authorized . . . .")). In any event, the possible purpose of maintaining order within the jail gives Deputy Pugh's conduct at least the "pretense of lawful right." *McGhee*, 679 So. 2d at 733 (internal citations omitted). Ultimately though, even assuming a jury credits Plaintiff's version of events and finds Deputy Pugh acted with excessive force, a reasonable jury may not conclude that he acted in bad faith, with a malicious purpose, or in a manner exhibiting

wanton and willful disregard of Plaintiff's rights—in which case Sheriff Lemma and Seminole County could be held vicariously liable for Deputy Pugh's actions. *See id.* ("In any given situation either the agency can be held liable under Florida law, or the employee, but not both.").

In sum, considering the conflicting evidence amassed and the fact that applying statutory immunity "is so closely bound up with [Deputy Pugh's] mental state," the Court finds there is a genuine issue of material fact as to whether Deputy Pugh acted in bad faith, maliciously, or with wanton and willful disregard for Plaintiff's rights. *Butler v. Gualtieri*, 41 F.4th 1329, 1340 (11th Cir. 2022) (highlighting that it is not the district court's role "to wade into the remaining factual disputes and make determinations regarding the witnesses' credibility, let alone draw appropriate inferences from the proffered facts").[16] As such, the Court cannot resolve immunity at this stage with regard to Deputy Pugh, Sheriff Lemma, and Seminole County, and thus, summary judgment is due to be denied.

---

[16]   In *McGhee v. Volusia County*, the Supreme Court of Florida explained:

> Here, [the deputy] clearly had the lawful authority to restrain arrestees, detain them, or even respond with force in appropriate situations. His office gave him that authority, and he therefore cannot be described as a usurper. The fact that [the deputy] may have intentionally abused his office does not in itself shield the sheriff from liability. In sum, the question must be put to the fact-finder whether [the deputy] acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or willful disregard of human rights, safety, or property.

679 So. 2d at 733.

2.     *Count V – Intentional Infliction of Emotional Distress (Deputies Pugh, Jean, and Ortiz)*

Lastly, Deputies Pugh, Jean, and Ortiz move for summary judgment on Plaintiff's claim for intentional infliction of emotional distress, arguing Plaintiff has failed to establish the requisite elements and, in any event, Defendant Deputies are immune from suit pursuant to Florida Statute 768.28(9)(a). (Doc. 219, pp. 24–25).

To state a claim for intentional infliction of emotional distress under Florida law, the plaintiff must plead: "(1) deliberate or reckless infliction of mental suffering; (2) by outrageous conduct; (3) which conduct must have caused the suffering; and (4) the suffering must have been severe." *Hart v. U.S.*, 894 F.2d 1539, 1548 (11th Cir. 1990) (citing *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278 (Fla. 1985)).

The Florida Supreme Court defines "outrageous conduct" as follows:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Metro. Life Ins. Co.*, 467 So. 2d at 278–79 (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965)). "In applying that standard, the subjective response of the person who is the target of the actor's conduct does not control the question of whether the tort of intentional infliction of emotional distress occurred." *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 594–95 (Fla. 2d DCA 2007). "Rather, the court must evaluate the conduct as objectively as is possible to determine whether it is atrocious, and utterly intolerable in a civilized community." *Id.* at 595 (internal quotations omitted).

Again, as stated in various iterations herein, upon Plaintiff being ordered to fully undress and throwing his shirt off in frustration, Deputies Pugh and Jean took Plaintiff to the ground. (Doc. 219-5, ¶¶ 7–8; Doc. 219-9, ¶¶ 6–7; Doc. 219-21, 86:5–87:12, 98:3–12, 100:17–101:3). Once down, Deputy Ortiz held Plaintiff's legs while Deputies Pugh and Jean kept control of Plaintiff's arms. (Doc. 219-5, ¶¶ 7–8; Doc. 219-9, ¶¶ 6–7). Then, with the help of Deputies Ortiz and Jean securing Plaintiff on the floor, Plaintiff testifies that Deputy Pugh choked him to the point he lost consciousness, fractured his ribs, and urinated himself in front of the other Deputies. (*See* Doc. 216, ¶ 28; Doc. 219-5, ¶¶ 7–8; Doc. 219-9, ¶¶ 6–7; Doc. 219-18, 36:17–23; Doc. 219-21, 91:12–13, 94:8–15). Plaintiff was ultimately left naked in pain on the floor of the ADA cell, listening to the Deputies laughing at him outside the door. (Doc. 219-21, 96:21–98:14).

If a jury were to accept the aforementioned evidence presented by Plaintiff as true, a reasonable jury could conclude that the Deputies actions against Plaintiff

were conducted deliberately or recklessly to inflict mental suffering and were sufficiently outrageous. With regard to statutory immunity, the Court has already found that a genuine issue of material fact exists as to whether Deputy Pugh acted in bad faith, maliciously, or with wanton and willful disregard for Plaintiff's rights. Thus, Deputies Pugh, Jean, and Ortiz are not entitled to immunity at this stage, and summary judgment must be denied.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment (Doc. 219) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on January 26, 2024.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties