**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**YOUSRY RIZK,**

       **Plaintiff,**

v.                            **Case No: 6:18-cv-1414-PGB-RMN**

**AKEBO PUGH, JOHNNY JEAN, ANGEL ORTIZ, BIJU VARGHESE, DENNIS M. LEMMA and SEMINOLE COUNTY, FLORIDA,**

       **Defendants.**
_____/

**ORDER**

This cause is before the Court on the Plaintiff's *Daubert* Motion to Exclude Robert Reardon. (Doc. 211). The Defendants filed a Response in Opposition. (Doc. 218). Upon due consideration, the Plaintiff's motion is granted.

**I.  BACKGROUND**

The procedural history of this case has been outlined in other Orders. (Docs. 166—169). In summary, Mr. Rizk alleges that on January 18, 2018, he was arrested on a misdemeanor charge after an altercation with his homeowner's association, and while in police custody Deputy Pugh used excessive force when he threw his shirt to the floor out of frustration. (Doc. 170, ¶¶ 26–36). Mr. Rizk further claims that Deputies Jean and Ortiz failed to intervene and that Nurse Varghese acted with deliberate indifference to his serious medical needs. (*Id.* ¶¶ 37–50). The

Defendants retained Mr. Robert Reardon to offer opinions concerning the reasonableness of Deputy Pugh's use of force, the timeliness of "medical actions" during Mr. Rizk's incarceration, and whether the Defendants comply with national standards. (Doc. 211-1). The Plaintiff moves to exclude Mr. Reardon as an expert witness. (Doc. 211).

## II. LEGAL STANDARDS

The Court's analysis of the admissibility of expert testimony begins with Federal Rule of Evidence 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

As explained by the Supreme Court, the purpose of the expert admissibility rules is to enlist the federal courts as "gatekeepers" tasked with screening out "speculative" and "unreliable expert testimony." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). In the Eleventh Circuit, the admissibility of expert testimony is distilled into these three factors:

2

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
>
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and
>
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted). "While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts . . . ." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). As to the reliability prong, admissibility under Daubert inherently requires the trial court to conduct an exacting analysis of the proffered expert's methodology. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002). The Supreme Court has identified several factors for courts to consider when conducting that analysis, including (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has undergone peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant scientific community. *Daubert*, 509 U.S. at 593–94.

"Of particular relevance to an expert proffered for his experience, the court notes that neither Daubert nor its progeny preclude experience-based testimony." *Butler v. First Acceptance Ins. Co.*, 652 F. Supp. 2d 1264, 1272 (N.D. Ga. Aug. 17,

2009) (quoting *Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999)). Even so, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only the ipse dixit of the expert," and the "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "When an expert relies primarily on experience, the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Butler*, 652 F. Supp. 2d at 1272 (quoting *Frazier*, 387 F.3d at 1261). This is because "[a]n expert's qualification and experience alone are not sufficient to render his opinions reliable," and expert testimony does nothing more than what lawyers can argue in closing does not help the trier of fact. *Id.*

In *Specht v. Jensen*, 853 F.2d 805, 808–09 (10th Cir. 1988), the Court recognized that "our system reserves to the trial judge the role of adjudicating the law for the benefit of the jury." Accordingly, "an expert witness cannot state a legal conclusion by applying the law to the facts, passing upon weight or credibility of the evidence, or usurping the province of the jury by telling it what results should be reached." *Baumann v. Am. Fam. Mut. Ins.*, 836 F. Supp. 2d 1196, 1201 (D. Colo. Dec. 28, 2011); *see also Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law."). It is ultimately the burden of the party who offers the expert to show that the expert's opinion is

4

admissible, and the party must do so by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005).

## III. DISCUSSION

### A. Use of Force

The Plaintiff argues that Mr. Reardon should be precluded from offering an opinion about the reasonableness of Deputy Pugh's use of force because Mr. Reardon's opinions improperly invade the province of the jury and are unreliable. (Doc. 211, p. 2). That is, Mr. Reardon concludes that the Plaintiff's version of the altercation is unreliable and the law enforcement Defendants' version is credible. (*Id.* at pp. 2–3). Finally, Mr. Rizk argues that Mr. Reardon's use of force opinions are not supported by a reliable methodology. (*Id.*).

The Defendants agree that Mr. Reardon "cannot tell the jury which version of the use of force incident should be believed and cannot comment specifically as to the credibility of a witness, [he] should [however] be permitted to testify as to which facts formed the basis of his opinions." (Doc. 218, p. 6). That said, the Defendants do not articulate how Mr. Reardon can discuss which facts supported his opinions without improperly offering an opinion about Mr. Rizk's credibility.[1] When asked at deposition, Mr. Reardon admitted his opinion on the reasonableness of Deputy Pugh's use of force rests on his view of Rizk's credibility:

---

[1] For example, Mr. Reardon lists in his report statements made by Mr. Rizk following his arrest which he characterizes as reflecting erratic or at least combative behavior. (Doc. 211-1, Sec. III, ¶¶ 3–6, 10–12). Mr. Reardon also relies on police reports in which Mr. Rizk is described as "belligerent, uncooperative, refusing to follow staff direction." (*Id.* ¶¶ 14, 15–19).

> Q. Are you seeking to provide an opinion of what actually occurred on January 18, 2018, between the defendants and Mr. Rizk?
>
> A. On the information that was provided, yes.
>
> Q. Are you making assessments as to whether certain information is believable or not believable?
>
> A. Yes.

(Doc. 211-2, 17:5–11).

> Q. Is this your professional opinion that Mr. Rizk's inconsistent statements lead you to question his perception of events?
>
> A. Yes.
>
> Q. And is that what you are going to tell the court and the jury?
>
> A. Yes.
>
> Q. And are you going to seek to tell the jury which statements should or should not be believed?
>
> A. Well, based off my opinion of reviewing the events, yes.

(*Id.* 71:13–23).

Under the hearing Summary of Findings, Mr. Reardon lists his expert opinions. (Doc. 211-1, pp. 12–13). Mr. Reardon opines, *inter alia*, that the force employed by Deputy Pugh "was appropriate and not excessive"; "[t]he statements provided by Yoursy Rizk are objectively erratic"; and "[b]ased upon the information provided directly by Yoursy Rizk, it would be difficult to believe any information provided by him from an objective perspective."

The Plaintiff is correct, and the Defendants acknowledge, that an expert witness may not offer an opinion on whether Deputy Pugh used excessive or

6

unreasonable force. *See Bruton v. City of Homestead*, No. 20-23960-CIV, 2022 WL 1045556, at *4 (S.D. Fla. Mar. 4, 2022) (citing *Montgomery*, 898 F.2d at 1541). To allow Mr. Reardon to tell the jury whether he believes the Defendant used excessive force "would essentially remove from the jury the task of applying standards of reasonableness and replace it with the task of evaluating the testimony of the parties' expert." *Id.* (citing *Lizarazo v. Greaves*, No. 16-cv-20558, 2018 WL 8224943, at *2 (S.D. Fla. June 1, 2018)). And an expert may not testify "concerning the truthfulness or credibility of a witness . . . because it invades the jury's province to make credibility determinations."[2] *Jetport, Inc. v. Landmark Aviation Miami, LLC*, No. 16-cv-23303, 2017 WL 7734095, at *8–10 (S.D. Fla. July 19, 2017) (quoting *United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996)). And yet this is precisely what Mr. Reardon purports to opine as stated in his expert report and at deposition.

      The Plaintiff also argues that Mr. Reardon's opinion on the use of force is not supported by a reliable method. (Doc. 211, pp. 2–3). The defense counters that Mr. Reardon explained at deposition that his methodology is based on his "experience of working in detention and in correctional facilities for the last 32 years, being an AC auditor and dealing with the 380-plus standards being audited by the BCCHC system for multiple agencies at multiple timeframes." (Doc. 218, p. 9 (quoting Doc. 211-1, 14:14–18)). The defense submits that Mr. Reardon created a

---

[2] Mr. Reardon admits that the jury does not need his expert testimony about Mr. Rizk's credibility, even if admissible, because a layperson evaluating his words and actions can come to the same conclusion. (Doc. 211-2, 38:8–19).

7

chronological timeline based on the documentation regarding the use of force, and he reviewed the materials below:

> 1. The "Best Standards" created by national and state organizations for the operation of the jail;
>
> 2. The Seminole County Sheriff's Office's accreditation history with the American Correctional Association;
>
> 3. The National Commission for Correctional Health Care;
>
> 4. The Florida Corrections Accreditation Commission, and
>
> 5. The written policies, practices, and procedures regarding the use of force incident and Plaintiff's incarceration.

(Doc. 218, pp. 9–10 (quoting Doc. 211-1, pp. 3, 5–8)).

The Defendants are correct that Mr. Reardon created a timeline beginning with his arrest through his arrest, and he identifies the information he reviewed in forming his opinions. That said, the list of materials relied on by Mr. Reardon does not refer to the "Best Standards" created by national and state organizations for the operation of jail,[3] or how such standards relate to his ultimate, albeit improper, opinion that the force used by Deputy Pugh was reasonable. And while Mr. Reardon states in his report that the Seminole County Sheriff's Office sought and received accreditation from the American Correctional Association ("**ACA**"), and the National Commission for Correctional Health Care ("**NCCHC**"), he fails to

---

[3] Mr. Reardon only lists Policy 09.13 Frisk, Strip and Body Cavity Searches, Policy 17.02 Intake and Booking Procedures, and Policy 17.03 Processing Inmate Property in Section II (Information Reviewed in Forming my Opinion). (Doc. 211-1, pp. 4–5). The list of information relied upon by Mr. Reardon also does not mention The National Commission for Correctional Health Care or The Florida Corrections Accreditation Commission.

articulate how the accreditation relates to his opinion on the use of force. (Doc. 211-1, p. 10). Similarly, Mr. Reardon volunteers that the John E. Polk Correctional Center has been accredited by the Florida Corrections Accreditation Commission ("**FCAC**") since 2004 and that Florida created voluntary standards for jails to follow for "Best Practices," but he does not explain how this is relevant. Aside from sounding impressive, accreditation by these organizations lacks meaning. Without substantive analysis, allowing Mr. Reardon to testify about the FCAC, ACA, or NCCHC is merely bolstering the credibility of the John E. Polk Correctional Center and is more prejudicial than probative.

"When an expert relies primarily on experience, the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Butler*, 652 F. Supp. 2d at 1272. The defense tries to salvage Mr. Reardon's opinion on the use of force by conceding that he may not testify that the amount of force used against Mr. Rizk was reasonable or that Mr. Rizk is not a credible witness. But the defense does not explain what remains of Mr. Reardon's use of force opinion when stripped of the inadmissible portions. This is most likely because Mr. Reardon's report is devoid of analysis. He simply lists 34 documents, creates a simple timeline from police reports, and identifies organizations offering accreditation. Mr. Reardon then concludes without analysis that the Plaintiff is not

9

to be believed and that the use of force was reasonable. [4] Simply put, Mr. Reardon's opinions about the use of force are improper, unreliable, and mere ipse dixit. The Plaintiff's motion to preclude Mr. Reardon from offering opinions on the reasonableness of the force used by Deputy Pugh is granted.

## B. Deliberate Indifference

Deliberate indifference to a pretrial detainee's serious medical needs constitutes a Fourteenth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1115 (11th Cir. 2005). To prevail on a deliberate-indifference claim, Plaintiff must show: "(1) a serious medical need; (2) deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).

On the first prong, a serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)).

---

[4] A Fourteenth Amendment excessive force claim requires, first, that a law enforcement officer purposely or knowingly use force against a pretrial detainee and, second, that the application of force is done in an objectively unreasonable way, without regard to an officer's subjective intent to harm. *Watkins v. Pinnock*, 802 F. App'x 450, 461 (11th Cir. 2020) (citing *Piazza v. Jefferson County*, 923 F.3d 947, 952 (11th Cir. 2019)). Whether the use of force is objectively unreasonable is determined using the particular facts and circumstances of each case, and the court must make this determination based on the perspective of a reasonable officer on the scene, including what the officer knew at the time of the incident, not with the court's benefit of hindsight. *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Mr. Reardon's expert testimony does not aid the jury in deciding whether the force employed was excessive.

Alternatively, a medical need is serious where the delay in treatment "worsens the condition." *Id.* "In either case, 'the medical need must be one that, if left unattended, poses a substantial risk of serious harm.'" *Id.* (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)).

Inadvertent failures to furnish necessary medical treatment fall short of generating constitutional claims. The second prong therefore requires Plaintiff to establish: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004). Not that a defendant must know the precise nature of a detainee's injuries and ignore them to expose him or herself to liability. *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 252 (5th Cir. 2018) (concluding that courts do not require state officials to be warned of a "*specific* danger" to be held liable for deliberate indifference to a serious medical need). "Liability can attach even if a prison official knows only that, if no action is taken, the detainee faces a 'substantial risk of serious harm.'" *Taylor v. Hughes*, 910 F.3d 729, 734 (11th Cir. 2019). Likewise, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Dang ex rel. Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)).

The Plaintiff contends that Mr. Reardon should be prevented from offering expert testimony on whether Nurse Varghese was deliberately indifferent to Mr. Rizk's serious medical condition. (Doc. 211, p. 17). The Plaintiff argues that Mr.

Reardon is not qualified to offer opinions on the standard of care, because he is not a medical expert. (*Id.*). At deposition, Mr. Reardon said that he is not qualified to offer an opinion on the medical care, or lack thereof, provided to Mr. Rizk after the alleged incident. (*Id.* at p. 18 (quoting Doc. 211-2, 13:3–6; 40:12–15)). Despite his lack of medical knowledge, Mr. Reardon wants to tell the jury that Nurse Varghese acted "appropriately and timely" to provide medical care after the incident. (*Id.* (quoting Doc. 211-2, 10:15–25)).

The Defendants concede that Mr. Reardon "would not be able to provide an opinion as to the timeliness of any actions taken after Varghese initially saw Plaintiff because it would be 'based off of whatever the discovery of the medical – the medical individual reviewing the offender actually came up with.'" (Doc. 218, p. 14 (quoting Doc. 211-2, 9:22–10:2)). That said, the Defendants want Mr. Reardon to tell the jury that the "timeliness of the evaluations and the screening of the medical staff are well within what are the requirements for [American Correctional Association] and [National Commission for Correctional Health Care], and reasonable Best Practices." (*Id.* (quoting Doc. 211-2, 12:17–22)).

Whether Nurse Varghese's response time following the incident meets the requirements established by the American Correctional Association or the NCCHC does not assist the jury in its analysis of the elements of the deliberate indifference claim. Mr. Reardon does not explain how these standards or guidelines (whatever they may provide) aid the jury in determining whether a serious medical need existed; whether Nurse Varghese was deliberately indifferent to that need; and/or

12

causation between that indifference and the Plaintiff's injury. That is, Mr. Reardon quotes the NCCHS Standard for evaluation of inmates as requiring screening "as soon as possible" meaning "promptly conducted without delay." (Doc. 211-1, pp. 11–12). Compliance with this standard does not help the jury determine whether the screening was meaningful; that is, whether Nurse Varghese possessed "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence." Nor does a jury require help from an expert to look at the documents that show Mr. Rizk was seen at 10:10, 10:52, 13:10, and 18:19 and to compare those times with the "NCCHC Standard." This is the sum of Mr. Reardon's analysis. Accordingly, Mr. Reardon's testimony is neither helpful nor relevant to any issue in dispute.[5]

### C. Florida Correctional Standards

The Plaintiff argues that Mr. Reardon should be precluded from offering opinions about the practices and standards applicable to the John E. Polk Correctional Center. (Doc. 211, p. 22). The Plaintiff submits that aside from citing the NCCHC Standard discussed above, he fails to articulate how any standards, national or otherwise, apply to the issues here. (*Id.* at p. 24). The Court has reviewed Mr. Reardon's expert report and agrees that it lacks discussion or analysis

---

[5] The defense argues Mr. Reardon's timeliness opinion goes to the causation issue. (Doc. 218, p. 15). This is an oversimplification of causation. The mere fact that a nurse shows up after an inmate is allegedly assaulted does not break the causal connection between the assault and the injuries. Deliberate indifference requires a critical analysis of the facts known to the healthcare provider and his or her response. Mr. Reardon's (lay) opinion that the Nurse's response was timely under the NCCHC creates the false impression that there was no deviation from the standard of care.

of how national or local correctional standards apply here. Rule 26(a)(2)(B) imposes a duty upon the expert to disclose in his or her report "a complete statement of all opinions the witness will express and the *basis and reasons* for them" and all "facts or data considered by the witness in forming them."[6]

Mr. Reardon puts forth generalities such as the Sheriff's Office receiving accreditation without explaining the significance of accreditation, what accreditation means, or how accreditation relates to the facts and issues in dispute. He repeats this process by loosely alluding to National Standards and "Best Practices" without identifying the specific practice, the authority that put for the practice or standard, or how the practice or standard relates to the facts. This process creates the illusion of legitimacy and professionalism. *Daubert* is designed to screen out junk science and ipse dixit masquerading as informed opinion. The risk in relaxing these exacting standards is seen in the Defendants' response where they suggest Mr. Reardon be permitted to opine:

> . . . that the Sheriff's Response to Resistance Policy of General Order #49 provides a "continuum of force with correlating levels of resistance that is in adherence to nationally recognized standards." (Doc. 211-1, p. 12). Reardon further opines that the review of the use of force incident involving Plaintiff by "four levels of supervision" was "well above the level of national standards" requiring a two-level process for review.

---

[6] "[T]he expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise[.]" *W. Union Holdings, Inc. v. E. Union, Inc.*, 316 F. App'x 850, 854 (11th Cir. 2008) (citation omitted). Moreover, the "purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify" so as to "minimize the expense of deposing experts, and to shorten direct examination and prevent an ambush at trial." *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 7507848, at *4 (S.D. Fla. Aug. 1, 2016) (citations omitted).

(Doc. 218, p. 18 (quoting Doc. 211-1, p. 12)).

If permitted, Mr. Reardon would tell the jury that the officers comply with the Resistance Policy of General Order #49, which order meets unspecified nationally recognized standards. Mr. Reardon does not list the Resistance Policy of General Order #49 in his disclosure of Information Reviewed in Forming Opinions, nor does he identify the "nationally recognized standards." (*See* Doc. 211-1, § II, pp. 4–5). The first time Order #49 appears in the report is under Section V (Assessment) where Mr. Reardon concludes without analysis that "[t]he written policy (General Order #49, Response to Resistance) is consistent with 'Best Practices' for law enforcement organizations." (*Id.* at p. 10). He then adds that "[t]he report written by Deputy Pugh justifies the use of and the level of force applied" again without explaining why the jury should accept this premise. (*Id.* at p. 11).

The Court agrees with the Plaintiff that Mr. Reardon's report is deficient, and his opinions about how the Defendants met or exceeded these so-called standards and best practices are inadmissible. Mr. Reardon's expert report violates Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, and his opinions are unsupported and unhelpful. Allowing Mr. Reardon to testify will infuse the trial with prejudice.

## IV.   CONCLUSION

For these reasons, the Plaintiff's *Daubert* Motion to Exclude Robert Reardon (Doc. 211) is **GRANTED.**

**DONE AND ORDERED** in Orlando, Florida on January 27, 2024.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

16